*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

VITA S. SHANNON,

       Plaintiff-Appellant,

v

ARON L. RALSTON,

      Defendant-Appellee.

UNPUBLISHED
May 23, 2019

Nos. 339944, 343213, 343886,
344356, 344418, and 346344
Oakland Circuit Court
LC No. 2017-852916-DC

Before: REDFORD, P.J., and MARKEY and K. F. KELLY, JJ.

PER CURIAM.

These consolidated cases arise from a custody dispute. In Docket No. 339944, plaintiff appeals by right a July 12, 2017 order entered by Oakland Circuit Judge Victoria Valentine, which required plaintiff to pay the fees associated with an investigative guardian ad litem ("GAL").

In Docket No. 343213, plaintiff appeals by leave granted[1] Judge Valentine's February 14, 2018 opinion and order denying plaintiff's motion to vacate an arbitration order that had denied plaintiff's motion for summary disposition on her request for a change of domicile.

In Docket 343886, plaintiff appeals by right Judge Valentine's April 11, 2018 order denying plaintiff's motion for summary disposition, rejecting plaintiff's assertion that the parties' arbitration agreement failed to specify which issues were to be arbitrated.

In Docket No. 344356, plaintiff appeals by leave granted[2] Judge Valentine's November 21, 2017 order denying plaintiff's motion to disqualify the arbitrator based on alleged ex parte

---

[1] *Vita S Shannon v Aron L Ralston*, unpublished order of the Court of Appeals, issued June 28, 2018 (Docket No 343213).

communications with defendant. In Docket No. 344418, plaintiff appeals by leave granted[3] Judge Valentine's December 21, 2017 order denying plaintiff's motion for reconsideration of that order. In her motion for reconsideration, plaintiff not only repeated the claim of inappropriate ex parte communications, but also included a new allegation that the arbitrator used a derogatory term that demonstrated a bias against women.

Finally, in Docket No. 346344, plaintiff appeals by leave granted[4] Judge Valentine's May 9, 2018 order denying plaintiff's motion to disqualify the arbitrator based on the arbitrator's alleged financial interest in the case.

## I. BASIC FACTS

The parties were never married, but they have a five-year-old daughter. At the time the child was born, the parties lived in Colorado. When the child was approximately six months old, the parties agreed to a Parenting Plan in the District Court for the County of Denver, Colorado. The District Court also entered a related Order for Allocation of Parental Responsibilities. When the parties entered into the parenting plan, plaintiff was anticipating a move to Michigan. The parenting plan provided that, given the child's young age, plaintiff would have primary custody and defendant would have reasonable and liberal parenting time when he came to Michigan to visit. The Plan also provided that in the event of a controversy, the parties would agree to use a mediator and/or arbitrator to settle any disputes. Plaintiff and the child moved to Michigan in May 2014.

Michigan courts did not get involved in the matter until May 2017. Plaintiff alleged that the child made statements of sexual abuse against defendant in February 2017. Defendant's parenting time was limited during an investigation by Child Protective Services ("CPS"). On May 3, 2017, plaintiff moved to register the Colorado Parenting Plan as a foreign judgment in the Oakland County Circuit Court, Family Division and the Colorado Parenting Plan was registered as a foreign judgment on May 9, 2017.

As will be discussed in greater detail below, the court appointed an investigative GAL to help determine whether the child's alleged statements could be substantiated. After resolution of the matter, the parties, in accordance with their parenting plan, selected a mediator and arbitrator to resolve parenting time issues, including plaintiff's imminent move to California. Plaintiff moved with the child to California without court permission or permission from defendant. She continues to reside there with the child. The California courts have refused to take jurisdiction over the custody dispute, instead deferring to Michigan to resolve the matter. This has created

---

[2] *Vita S Shannon v Aron L Ralston*, unpublished order of the Court of Appeals, issued August 29, 2018 (Docket No 344356).

[3] *Vita S Shannon v Aron L Ralston*, unpublished order of the Court of Appeals, issued August 29, 2018 (Docket No 344418).

[4] *Vita S Shannon v Aron L Ralston*, unpublished order of the Court of Appeals, issued December 12, 2018 (Docket No 346344).

rather an anomaly in which none of the parties reside in Michigan. Plaintiff lives in California with the child and defendant continues to reside in Colorado.

## II. THE GAL'S FEES

Plaintiff argues that the trial court abused its discretion when it ordered plaintiff to pay the GAL's fees. She maintains that she acted appropriately in pursuing the investigation, a fact that was acknowledged by both the trial court and the GAL. We disagree. Plaintiff does not have an appeal of right over the trial court's order requiring her to pay the GAL's fees. Even if we treat this as an application for leave to appeal, plaintiff is not entitled to relief that was the result of actions to which she not only consented, but requested.

Defendant filed his motion to enforce the parties' Colorado parenting plan on May 31, 2017, after his parenting time was severely impacted by the allegations of abuse. In her response, plaintiff stated that on February 22, 2017, the child told plaintiff that defendant touched her inappropriately. Plaintiff filed a complaint with CPS on March 9, 2017, and thereafter restricted defendant from having parenting time during naptime and overnights. Plaintiff argued that enforcing the parenting plan was against the child's best interest. Plaintiff wrote that "[i]t's hard to know what actually happened to [the child.] She [sic] too young to give a complete and accurate statement about whether Father touched her inappropriately. In this situation, Mother believes that it is in [the child's] best interests for a therapist to determine whether and when Father should have unsupervised parenting time."

The parties gathered for a hearing on defendant's motion on June 7, 2017. At that time, defense counsel presented the court with the CPS report over plaintiff's objection. CPS concluded that there was no preponderance of the evidence that defendant sexually abused the child. This was not enough for plaintiff's attorney who stated that "there ought to be a therapist appointed for this child" and "I suspect a GAL might be appropriate." He added: "somehow there was a failure to convince authorities either way. But the issues are still ripe for concern and for consideration." Plaintiff's attorney indicated that plaintiff "reacted normally and said wait a minute, I'm not going to just turn this child over willy-nilly." The trial court agreed that plaintiff "took the proper steps" and "there was a CPS investigation," but the trial court did not "know how I'm more qualified than CPS to determine whether or not the allegations have merit." Plaintiff's attorney complained that the redacted CPS report was incomplete and that defendant had "lawyered up," hampering the investigation. The trial court queried: "How do I resolve this issue of whether or not this really happened to this child, so that I don't take the father's right to parenting time away from him?" Plaintiff's attorney suggested that "you could see the evidence of an investigation person, a GAL." He added: "I would hear from a GAL. I would appoint my representative. I wouldn't be concerned about CPS, I wouldn't be concerned about Birmingham [Police]; I'd be more concerned what my person, a GAL, would tell me . . ."

Defense counsel strongly opposed appointing a GAL. The trial court nevertheless agreed to placate plaintiff:

*The Court*: Okay. Here's what we're going to do. With regard to this matter, there is an indication the child has been sexually abused, there's been an objection to the CPS report because of a – a hearsay objection and the fact that Mr. Potts

[plaintiff's attorney] didn't get a chance to look at it and to cross-examine anybody with regard to it. Therefore, under section 722.1204[5], I am going to allow the father to have the parenting time, not have the overnights and not have the child during naptime. However, I'm also going to appoint a GAL, and the GAL is going to determine whether there's any merit with regard to this whatever. *If there's no merit, then the mother will pay* all the fees to fly the father back out here, all the fees for additional parenting time, meaning every single thing they do will be paid for by the mother, and *the GAL will be paid for by the mother*, okay?

*Mr. Potts*: Thank you.

\* \* \*

*The Court*: Okay. With regard to my ruling under the emergency statute, where I'm indicating that there's been allegations, that the mother isn't satisfied, my ruling is that Abbie Shuman will be appointed with regard to the sexual abuse issue, and that *if it's found that there is no basis for the allegations or for the mother to hold up the – the parenting time, she will pay all the costs and fees* associated with makeup parenting time, including all of the meals, all the activities, all of the airfare, *as well as the GAL being appointed*.

*Mr. Potts*: Thank you. [Emphasis added.]

The trial court's handwritten order specifically provided:

It is ordered that Abbe [sic] Shuman P35503 is appointed GAL and shall investigate the March 2017 allegations and make a parenting time recommendation re: limitations or enforcement of CO Parenting Plan.

*If the GAL does not find a basis for the allegations*, the cost of the GAL, cost of parenting time, including airfare, meals, hotel and activities and *fees incurred* to make up parenting time are the *sole responsibility of mom*. [Emphasis added.]

Shuman's June 28, 2017 report recommended that parenting time return to the previous Colorado parenting plan, with no restrictions on overnights or naps. The report indicated that Shuman had met with and interviewed both parents and also had numerous opportunities to observe defendant interact with the child. Shuman had only glowing comments about defendant's interactions with the child. Shuman also had an opportunity to meet with the Carehouse employees. Based on her investigation, Shuman concluded:

GAL spoke with Carehouse on June 12, 2017. Carehouse described their interview with [the child]. She was very active, bouncing around the room with a lot of energy. She did not volunteer nor confirm any kind of inappropriate

---

[5] MCL 722.1204 allows for assertion of temporary emergency jurisdiction.

-4-

touching by the father. There was some possible indication that she might be repeating something she had heard [This is the interpretation by this GAL of the information that Carehouse shared]. GAL has reviewed the CPS investigation which was not substantiated. Police reports do not indicate any pursuit of action related to inappropriate behavior, touching, etc. by the father. [Bracketed portion in original.]

\* \* \*

GAL feels that both parents appear to have a good relationship with [the child]. However, she is a very high energy 3 ½ year old child who is trying to make sense of and adapt to the back and forth parenting time, in addition to all of the other activity taking place in her life (e.g., therapy beginning and ending, day care school ending, summer programs beginning, etc).

GAL is aware that father has some responses to [the child's] actions that would benefit from parenting classes or 'parenting therapy' as [the child] can test her limits.

Recommendation: That the Parenting Time be returned to the previous existing order; That there does not appear to be any basis for denying the father overnights, nap time, etc. based on the information from investigations that have been done to date by CPS, Care House, Police involvement.

That the child, . . ., be involved in therapy directed toward working on child's anxiety, possible insecurities as a result of the separation of the parents and the back and forth parenting time which may be upsetting or, at a minimum, confusing to the child, conflicting loyalties child feels about parents; That the therapist should see [the child], but also involve mother and father in therapy; Both parents have agreed that this is a good idea. Individual therapy in this situation for mother and for father seems essential with releases to the 'family' therapist.

Further, that father be allowed Skype and phone access during the time periods that he does not have in-person parenting time so that [the child] has continuity with her father.

Further, GAL recommends that, in part, as a result of information gleaned from the history of the relationship between mother and father, that Father submit to several random substance abuse screens to be released to GAL.

As a result of Shuman's report, defendant filed a renewed motion to enforce the parenting time agreement. Shuman attended the July 12, 2017 hearing. She provided the following observations at the court's request:

*Ms. Shuman*: . . .The bottom line here is that I – I believe that I was tasked by the Court to make a determination as to whether or not there may have been any kind of criminal sexual conduct, sexual acting out. I could not find any evidence from

anybody that I talked to, nor was any other organization or agency going to pursue that. I have come to the conclusion that no, there's nothing there.

I don't know how much further the Court wants me to go. I actually went kind of beyond what the Court . . . ordered me to do; I always think that some parenting classes and time and experience is good for people with children. I will say that in my conversations with him, father had absolutely no issue when I said you know, do a drug test, someone thinks there's an issue, do a drug test. He said fine, I don't care, I'll do that. And I think if it would make anybody happy here to get that out of the way, he said he would do it; he had no qualms about that.

I know the Court read my report. I don't want to just reiterate everything that was in my report, but the bottom line is I did not find anything that could indicate to me that there were allegations here.

I – I do want to say one other thing. I believe – and I'm not sure about this suddenly – I believe that at the point that the Court appointed me to look into this, I think there had already been a Care House interview at that point -

*The Court*: There was.

*Ms. Shuman*: -- and I believe that mother had already been given the results of the Care House interview, which was that they were not going to move forward on anything. They could not -- they did not have anything to substantiate. CPS was not going to substantiate.

The trial court stood by its order that plaintiff pay all fees.

Plaintiff's attorney persisted and asked the court to reconsider, arguing that "the issue, Your Honor, is not the question of basis. It's whether my client acted appropriately." The trial court disagreed:

*The Court*: The order specifically says basis, and Ms. Shuman, can you clarify with regard to this matter, whether or not you think there was a basis for the investigation based upon the criminal sexual conduct allegation?

*Ms. Shuman*: I'm not a mind reader. I don't know what the mother thought she knew. I don't know what was going on. If the mother felt that she needed to have a Care House interview, she could do that, and she did.

After – I – I think that what Mr. Greenwald [defendant's attorney] is saying is correct, and of course I'm happy to be on any case, but *I think at the point that the Care House interview and CPS said we don't see anything here, I don't know – I think the mother had done whatever she had to do, and there was not a reason to go forward with anymore action.* That's kind of the best answer I can give.

*Mr. Potts*: That seems to be contradictory to the report.

-6-

*The Court*: Mr. Potts, with regard to this matter, if a mother ever feels that their child is in danger, of course the appropriate step is to have it investigated. I would never quibble with that. When the report came in when the investigation was done, when it was not substantiated, I can see trying to work on something to limit things. But to have a GAL come in, based upon her request to make sure that this child was okay, and I don't have a problem with it, but I don't know why the father would be punished with all these fees and costs if there was no basis for the GAL to be put in place. [Emphasis added.]

The trial court concluded:

I'm satisfied. I've heard enough argument with regard to this.

[P]ursuant to my order, Mr. Potts, . . . if the GAL does not find that the basis – a basis for the allegation, the costs of the GAL is to be covered, the cost of the parenting time, including the -- the airfare, meals, hotel, and activities and fees incurred to make up the parenting time are the sole responsibility of the mom.

Mr. Greenwald, this does not include the attorney fees, so those will not be included. Thank you.

In its July 13, 2017 order restoring defendant's parenting time under the parenting agreement, the trial court noted: "It is further ordered that the GAL has determined that [plaintiff's] allegations were w/o basis and therefore she shall pay all the expenses of the GAL . . ."

Plaintiff filed a motion for reconsideration on August 2, 2017. Plaintiff argued that there was a basis for her allegations and that she acted appropriately. Plaintiff continued to argue that "[t]he gravamen is why Mother acted the way she did. Father is focusing on the result of the investigation. However, as it relates to the Court order, the result of the investigation is not what determines whether Mother should have to pay for travel and GAL fees."

The trial court disagreed and denied plaintiff's motion for reconsideration, explaining:

the Court entered its July 12, 2017 Order, which found "that the GAL has determined that Petitioner's allegations were **without basis** and, therefore, she shall pay all the expenses of the GAL, costs of parenting time, including airfare, meals, hotel and activities and fees incurred to make up parenting time."

Plaintiff Mother, however, now files this Motion for Reconsideration, arguing the Court committed palpable error because the GAL's report found the Plaintiff Mother "acted appropriately." This same argument was repeatedly made by Plaintiff Mother's counsel at the July 12, 2017 hearing.

This issue, however, set forth in the Court's Order and explained on the record, is not whether the Plaintiff Mother *acted appropriately*. In fact, the Court noted at the hearing that, while it is certainly *appropriate* for any mother to take steps to investigate any danger to which she believes her child may be subjected,

the issue before the Court was whether there is a basis for the Plaintiff Mother's request for continued investigation of the unsubstantiated allegations of inappropriate sexual conduct by the Defendant Father. This issue, in turn, relates to who should bear those costs, including the costs of the GAL. Because the GAL found there was no basis for the allegations, costs were appropriately ordered. [Emphasis in original.]

Plaintiff does not have an appeal by right of this issue. MCR 7.203(a)(1) provides: "The court has jurisdiction of an appeal of right filed by an aggrieved party from the following: (1) A final judgment or final order of the circuit court, or court of claims, as defined in MCR 7.202(6) . . ." MCR 7.202(6) defines "final judgment" or "final order" as: "(a) In a civil case . . . (iv) a postjudgment order awarding or denying attorney fees and costs under MCR 2.403, 2.405, 2.625 or other law or court rule."

Here, the trial court did not award attorney fees. Instead, the trial court ordered that plaintiff pay the fees associated with a GAL appointed pursuant to MCL 722.27(1)(d), which provides:

(1) If a child custody dispute has been submitted to the circuit court as an original action under this act or has arisen incidentally from another action in the circuit court or an order or judgment of the circuit court, for the best interests of the child the court may do 1 or more of the following:

* * *

(d) Utilize a guardian ad litem or the community resources in behavioral sciences and other professions in the investigation and study of custody disputes and consider their recommendations for the resolution of the disputes.

MCL 722.22(g) defines "Guardian ad litem" as "an individual whom the court appoints to assist the court in determining the child's best interests. A guardian ad litem does *not* need to be an attorney." (Emphasis added.)

The fact that Shuman was an attorney did not convert her services into one as a lawyer-guardian ad litem ("L-GAL"), which is defined as "an attorney appointed under section [MCL 722.24.] A lawyer-guardian ad litem represents the child, and has the powers and duties, as set forth in [MCL 722.24.]" (Footnote omitted). MCL 722.24 provides, in relevant part:

(1) In all actions involving dispute of a minor child's custody, the court shall declare the child's inherent rights and establish the rights and duties as to the child's custody, support, and parenting time in accordance with this act.

(2) If, at any time in the proceeding, the court determines that the child's best interests are inadequately represented, the court may appoint a lawyer-guardian ad litem to represent the child. A lawyer-guardian ad litem represents the child and has powers and duties in relation to that representation as set forth in section 17d of chapter XIIA of 1939 PA 288, MCL 712A.17d. All provisions of section 17d

-8-

of chapter XIIA of 1939 PA 288, MCL 712A.17d, apply to a lawyer-guardian ad litem appointed under this act.

MCL 712A.17d sets forth an L-GAL's duties and powers. Just a cursory glance at section 17d reveals that an L-GAL is meant to have an on-going and continuous interest in the matter, with the focus being on the child's best interests. The statute requires the L-GAL to attend all hearings and monitor case plans and court orders. The trial court in this case specifically appointed Shuman for the limited purpose of investigating plaintiff's abuse allegations. Her duties began and ended with her investigation. That she was coincidentally an attorney did not alter her role in the case. Shuman's fees were not attorney fees by any stretch of the imagination. Consequently, plaintiff did not have an appeal as of right.

Even if we were to consider the merits of plaintiff's claim, we find *Gusmano v Gusmano*, unpublished per curiam opinion of the Court of Appeals, issued December 13, 2012 (Docket No. 307807) on point.[6] The mother in *Gusmano* argued that the trial court erred in requiring her to be solely responsible for the GAL's fees. *Gusmano*, unpub op, p 2. This Court rejected the mother's argument, pointing to the fact that the mother "specifically requested the GAL be appointed and the record indicates that she was aware that the appointment was made with the understanding that she would pay for it." *Id.* This was demonstrated when the mother failed to correct opposing counsel's statement that the mother would pay the GAL fees and when the trial court added "[y]ou pay for it," without any objection from the mother. *Id.* This Court concluded that the mother "willingly went along with the arrangement to pay for the GAL" and that she could not "take a position in the trial court and subsequently seek redress in an appellate court that is based on a position contrary to that taken in the trial court." *Id.* at p 3, quoting *Holmes v Holmes*, 281 Mich App 575, 587-588, 760 NW2d 300 (2008). Here, just as in *Gusmano*, plaintiff is precluded from challenging the trial court's decision.

## III. CHANGE IN DOMICILE

Plaintiff argues that the arbitrator acted outside the scope of his authority under MCL 600.5081(2) in finding that plaintiff needed court approval to move. She further argues that the trial court erred in failing to vacate the arbitrator's order.[7]

"This Court reviews de novo a trial court's ruling on a motion to vacate or modify an arbitration award. This means that we review the legal issues presented without extending any deference to the trial court." *Washington v Washington*, 283 Mich App 667, 671; 770 NW2d

---

[6] "Although MCR 7.215(C)(1) provides that unpublished opinions are not binding under the rule of stare decisis, a court may nonetheless consider such opinions for their instructive or persuasive value." *Cox v Hartman*, 322 Mich App 292, 307; 911 NW2d 219, 228 (2017), lv den 919 NW2d 639 (2018).

[7] Plaintiff's argument is conditioned on a finding that the arbitrator acted within the scope of his authority in considering the issue of change of domicile in the first place, which is the issue in Docket No. 343886.

908 (2009) (citations and quotation marks omitted). "Whether an arbitrator exceeded his or her authority is also reviewed de novo." *Id.* at 672.

On September 29, 2017, plaintiff filed a motion for summary disposition regarding a change of domicile. In the motion, plaintiff claimed that her employer required her to move to San Mateo, California. Plaintiff acknowledged that, in general, any move of over 100 miles required permission from the other parent or permission from the trial court after consideration of a number of factors in MCL 722.31. However, plaintiff argued that an exception existed under MCL 722.31(3), which specifically provided that the section did not apply to a situation in which a change of domicile would actually move the child closer to the other parent. The move to California would result in the child being less than 1,000 miles away from defendant compared to the over 1,000 with the child living in Birmingham, Michigan. It is notable that plaintiff did nothing to challenge the arbitrator's authority to decide the issue. In fact, plaintiff was the one who put the matter before the arbitrator.

The arbitrator denied plaintiff's motion in a written opinion and order dated November 3, 2017. The opinion came *after* plaintiff moved with the child to California on October 1, 2018. The arbitrator first looked to the governing documents. The "Order for Allocation of Parental Responsibilities" specifically provided that "Neither party shall relocate outside of the metropolitan Denver area with the minor child without written permission from the other party or Order of the Court." The accompanying parenting plan contemplated plaintiff's imminent move to Michigan. And the parties' arbitration agreement specifically provided that Michigan law applied. The arbitrator concluded:

> In the present matter, the Arbitrator accepts that the proposed move (which already took place) means there will be less 'radial miles' between Defendant and the child – i.e. San Mateo, California, is closer to Colorado (where Defendant resides) than it is to Birmingham, Michigan (which is where Plaintiff and the child resided before they moved to California); however, the Order contains a provision stating that "written permission from the other party" is required before a move is made, and if the other party does not grant permission, then an "Order of the Court" must be obtained. As such, the instant case is consistent with *Gagnon, supra*, because when "a child's custody is governed by a court order that prohibits the child from moving to another state without the permission of the court", criteria found in MCL 722.31 must be evaluated by the Court, or, as here, the Arbitrator.

> Nevertheless, Plaintiff will take the position that the statement in the Order only applies to moves from Denver. But this is not the case. Again, the Order states: "Neither party shall relocate outside of the metropolitan Denver area with the minor child without written permission from the other party or Order of the Court." Here, Defendant did not grant permission for Plaintiff to move the child from Birmingham to San Mateo. Consequently, an "Order of the Court" is required if the proposed move is to be formally effectuated. Given this situation, the parties implemented the arbitration clause in the "Parenting Plan", and in that regard, Plaintiff filed the instant (C)(10) Motion, which invokes the 'less distance' exception of MCL 722.31. But, as explained, *Gagnon* indicates that even when

-10-

an exception to the applicability MCL 722.31 exists (based on the statute itself), a provision in a court order can override the exception. In the present case this is what occurred. And the applicable Order provision is all-encompassing because the Order states that a court order must be obtained for relocations "outside of the metropolitan Denver area", and San Mateo, California is, of course, "outside of the metropolitan Denver area" (i.e. it is in California). Likewise, with respect to *Gagnon*, the "the proposed residence change involves leaving the state" (of Michigan, where the Order and "Parenting Plan" were registered). (The proposed move would also involve leaving the state of Colorado.)

Ultimately, the arbitrator denied plaintiff's motion for summary disposition and concluded that "the criteria set forth in MCL 722.31(4) must be evaluated (by way of arbitration) in connection with Plaintiffs relocation from Birmingham, Michigan, to San Mateo, California."

Plaintiff filed a motion to "correct the arbitrator's errors," arguing that the arbitrator's reliance on *Gagnon v Glowacki*, 295 Mich App 557; 815 NW2d 141 (2012) and *Mogle v Scriver*, 241 Mich App 192; 614 NW2d 696 (2000) was misplaced because the cases were factually distinguishable. Plaintiff argued that MCL 722.31 should be interpreted and applied *as written* and that a plain reading provides that moves over 100 miles that take a child nearer the other parent do not require an analysis under MCL 722.31(4).

The arbitrator rejected plaintiff's attempt to distinguish *Gagnon*:

This argument is in error because *Gagnon v Glowacki* specifically states that an inquiry under MCL 722.31(4) must be undertaken "regardless of the distance involved" if there is a "court order that prohibits the child from moving to another state without the permission of the court", and the move "involves leaving the state". (Emphasis added). Here, there is a court order, and the move involves leaving the state. Hence, "regardless of the distance involved" - ie. longer or shorter - the criteria set forth in MCL 733.31(4) cannot be bypassed. As such, there is no error or omission, and as a result, there is no basis to change the Arbitrator's Opinion and Award on this issue.

Finally, the arbitrator concluded:

What Plaintiff appears to be saying . . . is that since, on its face, the statute (MCL 722.31) contains exceptions (such as the legal custody exception, and the reduction-in-distance exception, which are both discussed herein), then those exceptions are the end of the story. But *Gagnon v Glowacki* - which post-dates both *Spires* (2007) and *Brausch* (2009) - says otherwise. As explained herein, even though MCL 722.31 contains exceptions to the applicability of its own section (4), those exceptions may be overridden if the operative child custody and parenting time order "prohibits the child from moving to another state without the permission of the court regardless of the distance involved[,] if the proposed residence change involves leaving the state". Here, the operative order requires an agreement between the parties or permission of the Court. Furthermore, the move in question involves leaving the state. Therefore, under *Gagnon v*

*Glowacki*, "the factors under MCL 722.31(4) are the proper criteria for the court to consider." That is the end of the story.

On December 27, 2017, plaintiff asked the trial court to vacate the arbitrator's opinion pursuant to MCL 600.5080 and MCL 600.5081(2)(c) on the basis that the arbitrator exceeded his powers. Plaintiff re-iterated the arguments she had made to the arbitrator: that *Gagnon* was distinguishable and that MCL 722.31(3) should be interpreted and applied on its face.

The trial court denied plaintiff's motion in a February 14, 2018 opinion and order. Quoting at length this Court's opinion in *Eppel v Eppel*, 322 Mich App 562; 912 NW2d 584 (2018), which confirmed the strict standard for setting aside an arbitrator's order under the Domestic Relations Arbitration Act ("DRAA"), MCL 600.5070 *et seq.*, the court concluded: "This Court cannot find there has been an error of law that is readily apparent on the face of the award without second-guessing the Arbitrator's thought processes." The trial court later denied plaintiff's motion for reconsideration, noting: "The Court finds that Plaintiff raises the same issues and/ or facts previously raised. Moreover, Plaintiff fails to address and discuss the recent published Court of Appeals decision in *Eppel* . . ., to which the Court cited in its Opinion and which sets forth the requisite standard for the Court to vacate the arbitrator's award."

On appeal, plaintiff argues that the arbitrator exceeded his authority by even deciding the change of domicile issue. MCL 600.5081(2)(c) provides:

> (2) If a party applies under this section, the court shall vacate an award under any of the following circumstances:
>
> * * *
>
> (c) The arbitrator exceeded his or her powers.

Our Court has recently explained:

> Under the domestic relations arbitration act (DRAA), parties to a domestic-relations proceeding may stipulate to submit their disputed issues to binding arbitration, pursuant to a written contract that defines, dictates, and limits the powers of the arbitrator. By default, the trial court is required to enforce the arbitrator's award. However, the trial court is required to vacate the award under MCL 600.5080(1) if the trial court finds the award adverse to the best interests of the child or, relevant to the instant matter, under MCL 600.5081(2)(c), if the arbitrator exceeded his powers. An arbitrator exceeds his or her powers if the arbitrator acts in contravention of controlling law, or exceeds the powers that the parties' agreement granted to him. The phrase "exceed his powers" is essentially longstanding shorthand for deviating from the contract or controlling law. In order for a court to vacate an arbitration award because of an error of law, the error must have been so substantial that, but for the error, the award would have been substantially different. Any such error must be readily apparent on the face of the award without second-guessing the arbitrator's thought processes, and the arbitrator's findings of fact are immune from review altogether. [*Eppel v Eppel*,

322 Mich App 562, 571–572; 912 NW2d 584 (2018) (citations and quotation marks omitted).]

Plaintiff maintains that the arbitrator acted both beyond the material terms of the arbitration agreement as well as outside his authority in issuing an opinion denying summary relief and finding that plaintiff required court permission prior to moving the child to California. In effect, plaintiff argues that the arbitrator had no business even deciding the change of domicile because, under the plain language of MCL 722.31(3), no permission from defendant or the court was even necessary. However, plaintiff invited any alleged error by asking the arbitrator to take up the issue in the first place.

> "Invited error" is typically said to occur when a party's own affirmative conduct directly causes the error. For example, in *Vannoy v City of Warren,* 386 Mich 686, 690; 194 NW2d 304 (1972), this Court explained that a party cannot seek appellate review of an instruction that he himself requested, saying, "Assuming error as claimed, that error comes within the purview of what of tradition and common sense is known as 'invited error.' " Appellate review is precluded because when a party invites the error, he waives his right to seek appellate review, and any error is extinguished. [*Cassidy v Cassidy*, 318 Mich App 463, 476; 899 NW2d 65, 75, lv den 501 Mich 908 (2017), quoting *People v Jones*, 468 Mich 345, 352 n 6, 662 NW2d 376 (2003).]

"It is settled that error requiring reversal may only be predicated on the trial court's actions and not upon alleged error to which the aggrieved party contributed by plan or negligence." *Cassidy*, 318 Mich App at 476, quoting *Lewis v LeGrow*, 258 Mich App 175, 210; 670 NW2d 675 (2003). Plaintiff may not argue that the arbitrator exceeded his authority when plaintiff was the one that requested the arbitrator to exercise his authority on that precise issue.

As to the merits of plaintiff's claim that the arbitrator committed an error of law, MCL 722.31 provides, in relevant part:

> (1) A child whose parental custody is governed by court order has, for the purposes of this section, a legal residence with each parent. Except as otherwise provided in this section, a parent of a child whose custody is governed by court order shall not change a legal residence of the child to a location that is more than 100 miles from the child's legal residence at the time of the commencement of the action in which the order is issued.

> (2) A parent's change of a child's legal residence is not restricted by subsection (1) if the other parent consents to, or if the court, after complying with subsection (4), permits, the residence change. This section does not apply if the order governing the child's custody grants sole legal custody to 1 of the child's parents.

> (3) This section does not apply if, at the time of the commencement of the action in which the custody order is issued, the child's 2 residences were more than 100 miles apart. This section does not apply if the legal residence change results in the child's 2 legal residences being closer to each other than before the change.

Subsection (4) then sets forth the factors to be used when a trial court decided a motion for domicile.

Plaintiff maintains that the exception in subsection (3) applies and that, because the move to California brings the child closer to defendant in Colorado, there was no need to seek permission from defendant or the court. In the trial court, plaintiff cited *Spires v Bergman*, 276 Mich App 432; 741 NW2d 523 (2007) and *Brausch v Brausch*, 283 Mich App 339; 770 NW2d 77 (2009), in support of her position.

In *Spires*, the mother wanted to move to Texas. She had sole legal and physical custody of the child. The trial court granted the mother's motion for a change of domicile, finding that because the mother had sole legal custody of the child, MCL 722.31 did not apply, and that it was not required to consider the factors enumerated in MCL 722.31(4). *Spires*, 276 Mich App at 434-435. On appeal, the father argued that common-law required the trial court to consider the so-called *D'Onofrio*[8] factors, as codified in MCL 722.31(4), regardless of the plain language of the statute regarding sole legal custody. This Court disagreed, explaining: "when the Legislature codified Michigan's usage of the *D'Onofrio* factors, it concurrently chose to expressly exempt custody cases in which the relocating parent has sole legal custody." *Spires*, 276 Mich App at 438. It added: "Use of the *D'Onofrio* factors in change-of-domicile cases is now exclusively controlled by MCL 722.31, and the language of MCL 722.31(2) plainly provides that '[t]his section does not apply if the order governing the child's custody grants sole legal custody to 1 of the child's parents.'" *Id*.

This Court also rejected the father's claim that MCR 3.211(C) compelled the trial court to consider the *D'Onofrio* factors. The rule provides:

A judgment or order awarding custody of a minor must provide that

(1) the domicile or residence of the minor may not be moved from Michigan without the approval of the judge who awarded custody or the judge's successor,

(2) the person awarded custody must promptly notify the friend of the court in writing when the minor is moved to another address, and

(3) a parent whose custody or parenting time of a child is governed by the order shall not change the legal residence of the child except in compliance with section 11 of the Child Custody Act, MCL 722.31.

The Court held: "the language of the court rule does not require the family court to consider the *D'Onofrio* factors. Instead, the court rule simply requires the court to comply with MCL 722.31, which by its own language makes consideration of the *D'Onofrio* factors unnecessary when the relocating parent has sole legal custody." *Spires*, 276 Mich App at 439.

---

[8] *D'Onofrio v D'Onofrio,* 144 NJ Super 200, 206–207, 365 A 2d 27 (1976)

In *Brausch*, the mother moved with the minor child from Michigan to Canada. She had sole legal custody of the child. The parties' divorce order indicated that were no prohibitions against moving the child out of state or more than 100 miles. *Brausch*, 283 Mich App at 343. However, the trial court, on the father's motion to modify custody, concluded that the provisions in the judgment of divorce that waived a parent's rights to a hearing on the child's removal from Michigan and waived the 100–mile rule were unenforceable and also found that a de facto joint legal custodial environment existed such that the provisions of MCL 722.31(4) applied. *Id.* at 346. On appeal, the mother argued that the trial court clearly erred when it failed to honor the language of the judgment of divorce, which awarded plaintiff sole legal custody of the child and also contained a domicile clause. This Court concluded that the provision regarding change of domicile was enforceable, but agreed that the trial court erred in ordering the child be returned to Michigan. *Id.* at 348.

This Court concluded that the plain and unambiguous language of the statute provided that a parent with sole legal custody is not restricted in the same manner as a parent with joint legal custody. "Parents with joint legal custody must obtain consent from the other parent, or permission from the trial court after a review of certain factors, before moving a child more than 100 miles. Neither consent nor consideration of the factors is necessary when a parent has sole legal custody." *Id.* at 349, citing *Spires*, 276 Mich App at437-438. The Court reconciled the plain language of MCL 722.31(2) with MCR 3.211(C). The Court explained:

> At first glance, it would appear that the provisions of MCL 722.31 and MCR 3.211(C) conflict. They do not. Simply stated, when a parent with sole legal custody desires to relocate, he or she must first obtain the trial court's approval, but the factors set forth in *D'Onofrio v. D'Onofrio,* 144 NJ Super 200, 206–207, 365 A 2d 27 (1976), and codified in MCL 722.31(4) do not apply to the request. Accordingly, pursuant to the court rule, plaintiff was required to obtain court approval of her potential move with the parties' child to Canada. [*Brausch*, 283 Mich App at 349–350.]

This Court concluded that "[t]he court rule and the statute that apply in this case can be read harmoniously, and their plain language cannot be interpreted as distinguishing between interstate and intrastate moves." *Id.* at 352.

Clearly, *Brausch* and *Spires* have limited applicability where both cases involved a move by a parent who enjoyed sole physical custody. That is not the case here where the parties share joint physical custody.

Instead, the case on point is *Gagnon v Glowacki*, 295 Mich App 557; 815 NW2d 141 (2012). In *Gagnon*, the mother wanted to move to Canada and filed a motion for a change in domicile. The trial court granted the motion and this Court affirmed. Although the parties did not dispute the application of MCL 722.31(4) in *Gagnon*, this Court, citing *Mogle,* stated:

> On its face, MCL 722.31 is only applicable when a parent attempts to change the domicile of a child to a location that is over 100 miles away. However, when a child's custody is governed by a court order that prohibits the child from moving to another state without the permission of the court, as is the case here, regardless

-15-

of the distance involved if the proposed residence change involves leaving the state, then the factors under MCL 722.31(4) are the proper criteria for the court to consider. [*Gagnon*, 295 Mich App at 566.]

On appeal, plaintiff argues that there is no order specifically requiring court permission to move after the child has moved out of Denver, that is, from Michigan to California or any other location. This argument is disingenuous in light of the facts of this case. The "Order for Allocation of Parental Responsibilities" specifically provided that "Neither party shall relocate outside of the metropolitan Denver area with the minor child without written permission from the other party or Order of the Court." The accompanying parenting plan contemplated plaintiff's imminent move to Michigan. "The Parents also acknowledge that Ms. Shannon intends on relocating to the State of Michigan in the near future." And the parties' arbitration agreement specifically provided that Michigan law applied. As defendant maintains, these provisions, read together, can result in only one logical interpretation – the child may reside in either the Denver area or Michigan without the agreement of the parties or permission from the court. The child residing in any other location, including moving from Michigan to California, is barred absent an agreement of the parties or permission from the court. The arbitrator properly concluded that in deciding whether to grant permission, the arbitrator was required to apply the provisions in MCL 722.31(4). Because the arbitrator did not exceed his authority or commit an obvious error of law, it follows that the trial court did not err in denying plaintiff's motion to vacate the arbitrator's opinion.

## IV. SCOPE OF ARBITRATION

On appeal, plaintiff points to MCL 600.5071, which requires that an arbitration agreement set forth the specific issues to be arbitrated. Plaintiff notes that when the arbitration agreement was signed on August 31, 2017, limited parenting time was the only issue; the arbitration agreement did not speak to any issue involving a change in custody of the child. She argues that the trial court erred when it denied her motion for summary disposition on the issue. We disagree.

"We review de novo a circuit court's summary disposition decision." *Packowski v United Food & Commercial Workers Local 951*, 289 Mich App 132, 138; 796 NW2d 94 (2010). "Summary disposition is appropriate when the trial court lacks jurisdiction of the subject matter." *Id*., quoting MCR 2.116(C)(4). "For jurisdictional questions under MCR 2.116(C)(4), this Court determines whether the affidavits, together with the pleadings, depositions, admissions, and documentary evidence, demonstrate a lack of subject matter jurisdiction." *Packowski*, 289 Mich App at 138–139.

On March 8, 2018, plaintiff filed a motion for summary disposition pursuant to MCR 2.116(C)(4) (lack of subject matter jurisdiction), challenging the arbitrator's ability to adjudicate defendant's December 2017 motion to change custody. In her motion, plaintiff argued that the parties' arbitration agreement was void because it did not conform to the requisites of MCL 600.5071 and, further, that the arbitrator could not hear and rule on the issue of child custody because the issue was not specified in the parties' arbitration agreement.

MCL 600.5071 of Michigan's Domestic Relations Arbitration Act provides:

Parties to an action for divorce, annulment, separate maintenance, or child support, custody, or parenting time, or to a postjudgment proceeding related to such an action, may stipulate to binding arbitration by a signed agreement that specifically provides for an award with respect to 1 or more of the following issues:

(a) Real and personal property.

(b) Child custody.

(c) Child support, subject to the restrictions and requirements in other law and court rule as provided in this act.

(d) Parenting time.

(e) Spousal support.

(f) Costs, expenses, and attorney fees.

(g) Enforceability of prenuptial and postnuptial agreements.

(h) Allocation of the parties' responsibility for debt as between the parties.

(i) Other contested domestic relations matters.

Plaintiff noted that one of the requirements of MCL 600.5071 is that the agreement must set forth, in writing, specific issues which are sought to be the subject of an award. In her motion, plaintiff argued that the arbitration agreement in this case failed to reveal, exactly, what issues were to be arbitrated. She maintained that the parties' use of the phrase "all issues in the pending matter" provided "no clue as to the identity of such issues." Plaintiff added that such language was meaningless, "leaving one to guess at issues which are arbitrable." Plaintiff maintained that she could not be required to arbitrate an issue which she did not agree to submit to arbitration. Because there was nothing in the arbitration agreement that referenced a change of permanent physical custody, plaintiff argued that the arbitrator lacked the ability to hear the issue. Plaintiff further argued that the parties' parenting plan, which was the document forming the basis for the proceedings in Michigan, did not speak at all to any change of permanent physical custody. Plaintiff found additional support for her claim in a letter defendant's attorney sent to the court's law clerk, which referenced the issues remaining to be determined by the arbitrator. This November 2017 letter mentioned nothing about custody. Plaintiff concluded that "it cannot be claimed, with any smidgeon of legitimacy, that the issue of a change in permanent physical custody of the parties' daughter was part of the Arbitration Agreement at the time it was signed."

Defendant responded that, under the parenting plan, the parties agreed to engage a mediator/arbitrator to assist them in making substantial or permanent changes to the parenting plan and resolving other disputes concerning the child. On August 31, 2017, the parties entered into the arbitration agreement, which clearly set forth arbitrator would decide "all issues pending in this matter." Defendant argued that since a request to change custody undoubtedly concerned a substantial or permanent change to the parenting plan, the arbitrator had authority to decide

defendant's motion for change of custody pursuant to the parties' parenting plan and arbitration agreement. Defendant pointed out that plaintiff never previously complained about the arbitrator deciding such matters. In fact, she was the one who presented the arbitrator with a motion regarding changing the child's domicile.

The trial court denied plaintiff's motion at an April 11, 2018 hearing.

Plaintiff filed a motion for reconsideration two days later. By this time, plaintiff was on her fourth attorney. At oral argument, the trial court had asked plaintiff's counsel to explain how plaintiff's May 3, 2017 "Request for Child Custody Determination/Registration Under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA")" impacted her claim that the parties did not contemplate child custody as an issue to be arbitrated. The standard form provided:

> 2. That petitioner [plaintiff] requests that this court register the attached child custody determination under the Uniform Child Custody Jurisdiction and Enforcement Act, MCL 722.1101 et seq.
>
> *   *   *
>
> The petitioner [plaintiff] requests that this court register the attached child custody determination.

Plaintiff explained that the form had no impact on the matter of arbitration because the document "is a request for the Parenting Plan . . .to be registered with the Oakland County Circuit Court. It does not indicate that Petitioner agreed to have any arbitration; nor does it even speak to a change in permanent physical custody." Plaintiff's attorney asked the court: "Query: What document shows that Petitioner agreed to arbitrate an issue about a change in permanent physical custody?"

The trial court provided the answer in its April 27, 2018, opinion and order denying plaintiff's motion for reconsideration. The court first noted that:

> under Colorado law, the term "custody" is not used in relation to child law issues. Rather, Colorado uses the term "parental responsibilities." Colorado law further provides for the "Allocation of Parental Responsibilities" (APR), which requires a determination regarding decision making responsibilities and parenting time. Moreover, §14-10-137.7, C.R.S. provides as follows:
>
> > 14-10-131.7. Designation of custody for the purpose of other state and federal statutes. For purposes of all other state and federal statute that require a designation or determination of custody, the parenting plan set forth in the court's order shall identify the responsibilities of each party. . . .
>
> Accordingly, on March 27, 2014, the parties agreed to a Parenting Plan that was entered by the District Court, City and County of Denver, Colorado ("Parenting Plan"). [Footnotes omitted.]

-18-

The trial court then looked to the specific provision in the parties' parenting plan, which included the following provisions: Decision-Making Authority; Parenting Time; and Mediation/Arbitration. The trial court also considered the Colorado court order that incorporated the parenting plan. On April 24, 2017, the parties entered into a "Stipulation to Modify Jurisdiction for Parenting and UCCJEA Related Issues," which requested the Colorado Court to cede jurisdiction for parenting and UCCJEA related issues to the Oakland Circuit Court. On May 3, 2017, plaintiff filed her "Request for Child Custody Determination/Registration Under the Uniform Child Custody Jurisdiction and Enforcement Act" to which plaintiff was required to attach "all judgments; decrees; and temporary, initial, and modification orders issued to date." Accordingly, plaintiff attached the parties' parenting plan. The trial court again noted that on May 9, 2017, it entered the "Order of Registration of Child Custody Determination as a Foreign Judgment," which ordered that the "child custody determination" attached by plaintiff be registered in Michigan and filed as a foreign judgment. On June 7, 2017, the Court also signed the "Confirmation of Registration of Custody Determination Under UCCJEA (without hearing)," which specifically provided that "[t]he child custody determination registered on 5/9/2017 is confirmed and is subject to the same enforcement procedures as a child custody determination issued by this Court." The parties' subsequent arbitration agreement provided that the arbitrator would decide "[a]ll issues in the pending matter."

The trial court disagreed with plaintiff's position that only those issues pending at the time the agreement was entered were subject to arbitration.

> This Court disagrees and finds that [plaintiff] misconstrues the language of the "Arbitration Agreement." Contrary to Petitioner's claim, the Arbitration Agreement specifically related to "**all issues in the pending matter**" - not to only those issues that were pending at the time the Agreement was signed. (Emphasis added). Therefore, regardless of when the issue of physical custody arose, it is undisputedly an issue in the pending matter and is undisputedly an issue concerning [the child].

> Moreover, [plaintiff] queries the Court: "What document shows that [plaintiff] agreed to arbitrate an issue about a change in permanent physical custody?" . . . The Court answers [plaintiff's] query by referring [plaintiff] to the Parenting Plan to which she stipulated. While the term "custody" is not used in the Colorado "Parenting Plan," the "Parenting Plan" nevertheless [sic] specifically provides that "[the child] shall reside with the [plaintiff] Mother" and "[i]f this plan becomes unworkable, the parties shall utilize the mediation/arbitration process provisions." ("Parenting Plan," pp 4-5).

> While Colorado does not use the term "custody," Michigan law does. Under Michigan's Child Custody Act, MCL 722.21 *et seq*, a distinction is made between physical custody and legal custody: physical custody pertains to where the child shall physically "**reside**," whereas legal custody is understood to mean decision-making authority as to important decisions affecting the child's welfare. *Grange Ins Co of Mich v Lawrence*, 494 Mich 475, 511; 835 NW2d 363 (2013). Here, the parties agreed that "[the child] shall **reside** with [plaintiff] Mother." (Emphasis added). Accordingly, and contrary to [plaintiff's] claim, while the

-19-

magic term "physical custody" was not used, the Court finds the parties nevertheless agreed that Petitioner was awarded "physical custody" of [the child] and that if the parenting plan becomes unworkable, they shall utilize mediation/arbitration.

The Court further answers [plaintiff's] query by referring [plaintiff] to the specific **Mediation/Arbitration** section of the "Parenting Plan." Under this section, [plaintiff] agreed to "engage the services of a Mediator/Arbitrator ('Arbitrator')" to assist in making substantial or permanent changes to her Parenting Plan and resolving other disputes concerning [the child]" ("Parenting Plan," p 8, ¶ 1). The Court further refers [plaintiff] to Paragraph 2 of the **Mediation/ Arbitration** section of the "Parenting Plan" to which Petitioner agreed to utilize "the services of the Arbitrator" if "there are any disputes regarding a substantial or permanent change to this Parenting Plan that the Parents are unable to resolve by themselves." . . . In such instance, Paragraph 2 further provides that:

> The parents shall mutually agree upon a qualified person to act as Arbitrator. If the parents cannot agree within 7 days they shall each submit a name to the Court and the Court shall have jurisdiction to determine the Arbitrator. (See, "Parenting Plan," ¶ 2).

Certainly, [defendant's] motion to change physical custody is tantamount to seeking a substantial or permanent change regarding with whom [the child] shall reside, which, under the "Parenting Plan" is to be resolved by mediation/arbitration if the parties are unable to resolve this dispute themselves. Further, [plaintiff] acquiesced to submitting the issue of physical custody to Mr. Schnelz because she failed to submit a name to the Court for a new arbitrator under Paragraph 2 of the "Parenting Plan."

The Court finds that a request to change physical custody undoubtedly "concerns [the child]," and undoubtedly relates to a "substantial or permanent change to the Parenting Plan," which are issues [plaintiff] agreed to Mediate/Arbitrate. The Court, therefore, finds "physical custody" is an issue in this "pending matter" to which the parties agreed to arbitrate both under the "Parenting Plan" and under the "Arbitration Agreement."

The trial court's detailed recitation of the facts and explanation cannot be improved upon. The parties' agreement that "all issues in the pending matter" were subject to arbitration clearly included issues of domicile and custody.

An arbitration agreement is a contract by which the parties forgo their rights to proceed in civil court in lieu of submitting their dispute to a panel of arbitrators. The parties' agreement to submit a matter to arbitration constitutes the law of the case, and the arbitrators are bound to follow the guidelines set forth in the four corners of the document. The scope of arbitration is determined by the contract and arbitrators who derive their authority from the contract calling for their

-20-

services are bound to act within the terms of the submission. Independent of the contract, an arbitration panel has no jurisdiction over a particular dispute. [*Beattie v Autostyle Plastics, Inc*, 217 Mich App 572, 577–578; 552 NW2d 181 (1996) (cleaned up).]

Moreover,

> Arbitration is a matter of contract. Accordingly, when interpreting an arbitration agreement, we apply the same legal principles that govern contract interpretation. Our primary task is to ascertain the intent of the parties at the time they entered into the agreement, which we determine by examining the language of the agreement according to its plain and ordinary meaning. In considering the scope of an arbitration agreement, we note that a party cannot be required to arbitrate an issue which [it] has not agreed to submit to arbitration. The general policy of this State is favorable to arbitration. The burden is on the party seeking to avoid the agreement, not the party seeking to enforce the agreement. In deciding the threshold question of whether a dispute is arbitrable, a reviewing court must avoid analyzing the substantive merits of the dispute. If the dispute is arbitrable, the merits of the dispute are for the arbitrator. [*Altobelli v Hartmann*, 499 Mich 284, 295–296; 884 NW2d 537 (2016).]

Where, as here, arbitration is under the DRAA, there must be a written agreement that sets out the subjects of the arbitration and the arbitrator's powers. MCL 600.5071; MCL 600.5072(1)(e) ("The court shall not order a party to participate in arbitration unless each party to the domestic relations matter acknowledges, in writing or on the record, that he or she has been informed in plain language of all of the following . . . The arbitrator's powers and duties are delineated in a written arbitration agreement that all parties must sign before arbitration commences."); *Miller v Miller*, 474 Mich 27, 34; 707 NW2d 341 (2005) ("As long as the parties agree to some document that meets the minimal requirements of MCL 600.5071 and MCL 600.5072(1)(e), the agreement is sufficient."); *Cipriano v Cipriano*, 289 Mich App 361, 371; 808 NW2d 230 (2010) ("The DRAA requires that parties first sign an agreement for binding arbitration delineating the powers and duties of the arbitrator.") Again, "arbitration is a matter of contract and that the arbitration agreement is the agreement that dictates the authority of the arbitrators." *Cipriano*, 289 Mich App at 376.

It is difficult to conceive of language more all-encompassing than an agreement to arbitrate "all issues in the pending matter." This is demonstrated by plaintiff's own action of bringing a motion for summary disposition on the issue of her request for change of domicile, as discussed in Section III. The trial court did not err when it concluded that the arbitration agreement met the DRAA's requirements for statutory arbitration of a domestic relations dispute and was otherwise valid and enforceable.

## V. DISQUALIFICATION OF THE ARBITRATOR

Plaintiff argues that the trial court erred when it denied her various motions to disqualify the arbitrator.

The parties disagree about the standard of review. Defendant believes that the issue should be reviewed as though the trial court denied plaintiff's motion to vacate an arbitration award. Defendant believes that when the trial court denied plaintiff's motions for disqualification, it was confirming the arbitrator's refusal to disqualify himself. In contrast, plaintiff believes the issue should be reviewed, not as an appeal from an arbitration award, but as an appeal from a motion for disqualification. We agree with plaintiff's position and find support in MCL 600.5075, which provides:

> (1) An arbitrator, attorney, or party in an arbitration proceeding under this chapter shall disclose any circumstance that may affect an arbitrator's impartiality, including, but not limited to, bias, a financial or personal interest in the outcome of the arbitration, or a past or present business or professional relationship with a party or attorney. Upon disclosure of such a circumstance, a party may request disqualification of the arbitrator and shall make that request as soon as practicable after the disclosure. If the arbitrator does not withdraw within 14 days after a request for disqualification, the party may file a motion for disqualification with the circuit court.

> (2) The circuit court shall hear a motion under subsection (1) within 21 days after the motion is filed. If the court finds that the arbitrator is disqualified, the court may appoint another arbitrator agreed to by the parties or may void the arbitration agreement and proceed as if arbitration had not been ordered.

Although plaintiff may have asked the arbitrator to recuse himself on one occasion, plaintiff sought recourse from the trial court under the statute and the issue should be treated as one denying a motion for disqualification.

Moreover, MCR 3.216(E)(5) provides: "The rule for disqualification of a mediator is the same as that provided in MCR 2.003 for the disqualification of a judge. The mediator must promptly disclose any potential basis for disqualification." Although the court rule discusses "mediator" and not specifically "arbitrator," the arbitrator in this case played a dual role, acting as both mediator and arbitrator. As such, it is appropriate to look to MCR 2.003 and related case law to determine whether the arbitrator should have disqualified himself and whether the trial court erred in denying plaintiff's motions for disqualification.

Under these circumstances, we "review[] a trial court's factual findings regarding a motion for disqualification for an abuse of discretion and its application of the facts to the law de novo." *In re MKK*, 286 Mich App 546, 564; 781 NW2d 132, 143 (2009). An abuse of discretion occurs when a decision is outside the range of reasonable and principled outcomes. *Id*.

Plaintiff makes three discrete claims of bias warranting disqualification of the arbitrator: (1) that the arbitrator engaged in ex parte communication in violation of the arbitration agreement; (2) that the arbitrator used derogatory language in describing women; and (3) that the arbitrator was so enmeshed in the extrajudicial issue of plaintiff's clawing back of fees that it allowed the issue to impact his overall determination. Each of these must fail for various reasons. First, at the time of the ex parte communication, the arbitrator was acting as a mediator, not as an arbitrator and the prohibition against ex parte communications did not apply. Not only

that, but the arbitrator acted appropriately by apprising plaintiff's attorney of the communications. There was nothing about the circumstances surrounding the ex parte communication that demonstrates bias or the appearance of bias. Second, plaintiff's claim that the arbitrator used derogatory language in describing women is highly suspect and not the least bit timely. Instead, it appears that plaintiff was grasping at straws when she raised the issue in a motion for reconsideration of her first motion to disqualify. Third, there was nothing inappropriate about the arbitrator's conduct following plaintiff's claw-back of fees paid. Plaintiff's behavior occurred during the proceedings and, therefore, was not extrajudicial. The arbitrator was within his right to take judicial notice of her conduct and consider the conduct when determining moral fitness.

## 1. EX PARTE COMMUNICATIONS

On October 27, 2017, plaintiff filed her first motion to disqualify the arbitrator based on alleged ex parte communications. Plaintiff argued that while MCL 600.5081(2) provided a basis for setting aside an arbitrator's award, the "DRAA is silent . . . as to the criteria for which an arbitrator must recuse himself or be disqualified to continue to act as arbitrator with the exception of the arbitrator's impartiality . . .. If the conduct at issue, however, results in any award by the arbitrator being void ab initio, then the arbitrator must be disqualified." Citing *Cipriano v Cipriano,* 289 Mich App 361; 808 NW2d 230 (2010), plaintiff argued that defendant's ex parte communications with the arbitrator, which violated the clear terms of the parties' arbitration agreement, rendered the award void regardless of whether it impacted the arbitrator's impartiality and, because an award is per se void under those circumstances, it follows that the arbitrator exceeded his authority.

Defendant filed a response to plaintiff's first motion to disqualify on November 2, 2017. Defendant pointed out that any "bright line" rule regarding ex parte communications had no application in this particular situation where the arbitrator served as *both* mediator and arbitrator. The parties met with the arbitrator on September 12, 2017 and discussed a variety of issues. Because mediation was only partly successful, the rest of the issues needed to be arbitrated. Defendant also pointed out that the arbitrator never responded to defendant's unsolicited emails and, in fact, advised that any further ex parte communication would be inappropriate.

The trial court heard plaintiff's first motion for disqualification on November 8, 2017. The trial court noted the difficulty in this situation where the arbitrator was acting as both mediator and arbitrator:

> The issue in this case, . . .there's no bright line when you're talking about mediation or arbitration. And if you have issues that are going to arbitration, what are they? What are the issues that are defined for arbitration? Because I'm not certain that there's a violation whatsoever with ex parte communications. And I'm not sure you're in arbitration or mediation, and I don't know if you do, Mr. Dizik [plaintiff's counsel], 'cause you can't express to me where the bright line rule is.

There were, for example, continuing issues with the order reflecting the parties' August 31, 2017 mediation agreement, requiring a second mediation. It also resulted in defense counsel filing a

motion for entry of order with the trial court, which plaintiff deemed inappropriate. At the close of plaintiff's argument, the trial court stated: "I'm gonna contact your offices. I'm gonna request some additional information on some things. And then I'm going to issue an opinion." Thereafter, the trial court denied plaintiff's first motion for disqualification. The standard form included the following language: "Based on the arguments made before the Court on November 8, 2017 along with the parties' briefs and submission of issues, the Court is not satisfied that Mr. Schnelz should be removed as mediator/arbitrator in this matter, especially in light of a November 2, 2017 letter from Plaintiff's own counsel to opposing counsel and Mr. Schnelz, which specifically references issues to be addressed at mediation, not at arbitration."

Plaintiff filed a motion for reconsideration on December 12, 2017. Plaintiff acknowledged that "[a]lthough the fact that the conduct that has occurred does seem to indicate impartiality, or at a minimum, an appearance of impropriety, the most important aspect with regard to the instant action is the arbitrator's conduct which without question exceeded his powers as provided in the parties' arbitration agreement." Citing *Gates v USA Jet Airlines, Inc,* 482 Mich 1005, 762 NW2d 83 (2008), plaintiff argued that the ex parte communication rendered any subsequent awards void as a matter of law.

The trial court was unmoved by plaintiff's motion for reconsideration. At a December 20, 2017 hearing, the trial court stated:

With regard to your request for reconsideration, it's denied. . . .The issues previously were whether or not things were arbitrated, whether or not you got to cross-examine, et cetera. I do believe that this is just another attempt to try to get a different arbitrator with respect to this matter, and I don't see any basis for the reconsideration.

The trial court denied plaintiff's motion for reconsideration in a December 26, 2017, opinion and order, finding that plaintiff merely re-stated her previous arguments.

On appeal, plaintiff argues that the trial court erred in failing to grant plaintiff's request to disqualify the arbitrator on the basis of ex parte communications. Although not specifically labeled disqualifying, plaintiff argues that the grounds for vacating an award under MCL 600.5081(2) also constitute grounds for disqualifying an arbitrator under MCL 600.5075. MCL 600.5081(2) provides:

(2) If a party applies under this section, the court shall vacate an award under any of the following circumstances:

* * *

(c) The arbitrator exceeded his or her powers.

However, the statute is relevant only to vacating an arbitrator's *award*. That is not the case here. There is no award from which plaintiff seeks relief; instead, the issue on appeal is the trial court's refusal to disqualify the arbitrator based on ex parte communications. The statute cannot form the basis for disqualification. Instead, the relevant statute is MCL 600.5075, which, again, provides:

(1) An arbitrator, attorney, or party in an arbitration proceeding under this chapter shall disclose any circumstance that may affect an arbitrator's impartiality, including, but not limited to, bias, a financial or personal interest in the outcome of the arbitration, or a past or present business or professional relationship with a party or attorney. Upon disclosure of such a circumstance, a party may request disqualification of the arbitrator and shall make that request as soon as practicable after the disclosure. If the arbitrator does not withdraw within 14 days after a request for disqualification, the party may file a motion for disqualification with the circuit court.

(2) The circuit court shall hear a motion under subsection (1) within 21 days after the motion is filed. If the court finds that the arbitrator is disqualified, the court may appoint another arbitrator agreed to by the parties or may void the arbitration agreement and proceed as if arbitration had not been ordered.

However, assuming that MCL 600.5081(2) is applicable, plaintiff argues that the arbitrator exceeded the scope of his authority by acting contrary to the arbitration agreement, which expressly prohibited ex parte communication. Citing *Cipriano* and *Gates*, plaintiff argues that just as an arbitrator's violation of an arbitration agreement constitutes per se acting outside the scope of authority, it likewise serves as the basis for disqualification. In *Cipriano*, the arbitrator considered a husband's ex parte communications that were made after the arbitration hearing but before the award was issued. *Cipriano*, 289 Mich App at 368. Citing *Hewitt v Reed City*, 124 Mich 6, 8-9; 82 NW 616 (1900), the wife argued that the award was void as a matter of law regardless of whether the communication affected the arbitrator's partiality. *Cipriano*, 289 Mich App at 369. This Court rejected such a bright-line approach and, instead, considered whether the ex parte communication violated the parties' arbitration agreement. *Id.* at 371. The Court noted that "the parties' arbitration agreement . . . made no mention of ex parte communication with the arbitrator. . . . According to the parties' agreement, the arbitrator retained the discretion to receive information from [the husband] in order to expedite the proceedings." *Id.* at 372. In contrast, the parties' agreement here expressly prohibited ex parte communications.

In *Gates*, this Court rejected the defendant's argument that an arbitration award had to be vacated because of ex parte communications between the plaintiff and the arbitrators. *Gates v USA Jet Airlines, Inc*, unpublished per curiam opinion of the Court of Appeals, issued February 5, 2008 (Docket No. 272860). The majority concluded:

We have reviewed the document at issue in the instant case, which plaintiff submitted to the arbitrators after the parties' dispute had already been submitted for decision. Even assuming arguendo that the document was truly ex parte in nature, we simply cannot conclude that the document had the same effect on the arbitrators as did the ex parte communication discussed in *Hewitt.* The ex parte document submitted by plaintiff in this case contains no novel legal arguments or substantive legal authority. Instead, it merely represents a compilation of defendant's own revenue figures for 1996, 1997, and 1998. As such, the substance of the document at issue was already known to defendant, and it can hardly be said that the information contained therein was intended "to influence

the arbitrator[s] on a question of law." *Id.* at 8, 82 NW 616. Any improper communication between plaintiff and the arbitrators was therefore harmless, and plaintiff is entitled to no relief on this issue. [*Id.* unpub op at 2.]

Judge O'Connell dissented. He wrote:

> In the case at bar, plaintiff submitted a brief, without serving it on defendant, after the case was submitted. As in *Hewitt,* the brief that plaintiff submitted to the arbitrators contains substantive legal argument about the contractual bonuses plaintiff alleged he was entitled to receive under the employment agreement. In the brief, plaintiff urged the arbitrators to award him contractual bonuses, even if it adopted defendant's definition of "new revenues." In my opinion, the plaintiff's brief goes beyond what was submitted in *Hewitt,* because plaintiff included arguments in his brief and not merely objective, legal authority to support his position. . . .

> As in *Hewitt,* plaintiff's brief also violated the express rules governing the arbitration. The arbitrators instructed:

>> [T]here shall be no ex parte contact by any party with any arbitrator and . . . all pleadings, motions, briefs, discovery requests and responses, correspondence, exhibits, affidavits, documents and things of every type shall be served contemporaneously upon all arbitrators and counsel with a written and signed proof of service.

> Similar to the party in *Hewitt, supra* at 8, 82 NW 616, plaintiff submitted the brief without serving it on defendant, thus violating the express rules governing the arbitration. Based on this case's similarity to *Hewitt* and plaintiff's improper communication with the arbitrators, this Court should vacate the arbitration award. [*Gates*, unpub op, pp 3-4 (O'CONNELL, dissenting)]

Our Supreme Court reversed the judgment of the Court of Appeals and vacated the arbitration award, for the reasons stated in Judge O'Connell's dissenting opinion. *Gates v USA Jet Airlines, Inc*, 482 Mich 1005; 756 NW2d 83 (2008).

MCL 600.5081(2), *Cipriano* and *Gates* appear to support plaintiff's position that the arbitrator exceeded the scope of his authority by acting contrary to the arbitration agreement, which expressly prohibited ex parte communication. However, as evidenced above, the arbitrator was acting as *both* mediator and arbitrator. The ex parte correspondence appeared to occur while the parties were still mediating several issues. There is no definitive evidence that the arbitrator was acting as an arbitrator at the time of communication. As such, MCL 600.5081(2) is inapplicable. Moreover, unlike in *Cipriano* and *Gates,* the ex parte communication in this case occurred *before* the arbitration process was underway. In *Cipriano* and *Gates*, the parties attempted ex parte communications *after* the arbitration process was completed but before the awards were issued. Finally, as evidence by the arbitrator's emails, he immediately apprised the parties that defendant had produced ex parte communications. He took no action and, instead, advised counsel that the parties refrain from communicating with him

directly. Under the particular circumstances of this case, the ex parte communications did not form a basis for disqualifying the arbitrator.

## 2. DISPARAGING REMARKS

As previously stated, plaintiff raised the issue of the arbitrator's alleged disparaging remarks for the first time in her motion for reconsideration, following the trial court's denial of her first motion for disqualification. Plaintiff alleged that "the arbitrator made a disturbing remark in an August 2017 session with Plaintiff and her attorney." Plaintiff's December 11, 2017 affidavit, filed under seal, provided:

5. During mediation, one of the issues raised was my desire that the father of my three year old daughter, [the child], also the Defendant herein, not have paramours or guests of the opposite sex spend the evening while the Defendant exercised his parenting time.

6. While discussing the issue of prohibiting paramours during Defendant's parenting time, the mediator/arbitrator, Kurt E. Schnelz, Esq., said "paramours, I like that word. It is better than saying his [Defendant's] b*****s."

7. The arbitrator apparently felt comfortable using a derogatory and insulting gender-related term in front of me. This was the first day of mediation in my case and my first time having any experience with the arbitrator.

8. The arbitrator's comments regarding Defendant's "b*****s" made me uncomfortable. The comments made by the arbitrator also made me feel that the arbitrator did not have a great respect for women. This has resulted in me not trusting the mediation/arbitration process. The arbitrator has complete control over my case in his dual role as both mediator and arbitrator and his use of a misogynistic term destroyed any confidence I had in the system of dispute resolution he was solely in charge of.

9. I did not raise this issue earlier as I had and continue to have serious concerns about the arbitrator's control over the on-going process which involves serious decisions with respect to my own and my daughter's personal lives and futures and women are often vilified when they raise these types of issues and concerns.

In denying plaintiff's motion for reconsideration on this particular issue, the trial court ruled:

The Court finds that, with the exception of an affidavit that relates to an event that occurred prior to the last motion, Plaintiff's counsel raises the same issues and/or facts previously raised. The Court further finds that the affidavit relates to facts that could have been raised prior to the original order.

Again, this is an issue that could have and should have been raised back in August 2017 when the alleged statements were made. Instead, plaintiff merely reiterated the same arguments once she discovered her motion for disqualification based on ex parte communications was

denied. At the time the alleged comments were made, the parties had not yet signed the arbitration agreement. The arbitrator was acting as mediator.

MCR 3.216(E)(5) provides: "The rule for disqualification of a mediator is the same as that provided in MCR 2.003 for the disqualification of a judge. The mediator must promptly disclose any potential basis for disqualification."

"MCR 2.003 governs the procedure for disqualifying a judge due to a lack of impartiality to hear a case. This procedure is exclusive and must be followed." *Law Offices of Lawrence J Stockler*, *PC v Rose*, 174 Mich App 14, 23; 436 NW2d 70 (1989). A motion to disqualify a trial court judge must be filed with 14 days after the moving party discovers the ground for disqualification. MCR 2.003(D)(1)(a); *Cain v Dep't of Corrections*, 451 Mich 470, 494; 548 NW2d 210 (1996); *Kloian v Schwartz*, 272 Mich App 232, 244; 725 NW2d 671 (2006). "If a motion is not timely filed . . . untimeliness is a factor in deciding whether the motion should be granted." MCR 2.003(D)(1)(d); *In re MKK*, 286 Mich App 546, 565; 781 NW2d 132 (2009). "Delay in raising it in a disqualification motion until an unpopular order was entered makes it suspect and untimely." *Wayne Co Jail Inmates v Wayne Co Chief Executive Officer*, 178 Mich App 634, 665; 444 NW2d 549 (1989).

Plaintiff's motives are all the more suspicious because she *did* file a motion for disqualification based on defendant's ex parte communications with the arbitrator and failed to raise this important allegation. "[T]he moving party must include all grounds for disqualification that are known at the time the motion is filed." MCR 2.003(D)(2). This is not a situation where the disqualifying circumstances were not apparent to plaintiff at the time of her original motion. See *People v Gibson* (*On Remand*), 90 Mich App 792, 796; 282 NW2d 483 (1979). Plaintiff's gamesmanship will not be rewarded.

### 3. EXTRAJUDICIAL AND FINANCIAL CONFLICT

On May 2, 2018, several months after the trial court denied plaintiff's motion for reconsideration of her first motion for disqualification, plaintiff again sought to disqualify the arbitrator. This time she focused on his alleged financial interest in the proceedings. Plaintiff explained that on March 2, 2018, she paid the arbitrator $13,941.90, part of which ($6,441.90), was for an invoice for past services, and the other part of which ($7,500.00), was for an advance deposit for future billings. Plaintiff then "became concerned that the deposit of money for future services by the Arbitrator may have placed her in a vulnerable position, in that she would have a situation wherein she could have money taken prior to any invoice having been forwarded to her and prior to any explanation as to the necessity of such charges." Plaintiff then asked her credit card company to return some, but not all, of the funds. Thereafter, on April 19, 2018, the arbitrator contacted plaintiff's attorney to express his displeasure and indicated that plaintiff's actions would factor into the custody issues. Plaintiff alleged that the "fee matter" resulted in the arbitrator developing a bias against plaintiff. Plaintiff believed the arbitrator leveled inaccurate accusations against her. For example, the arbitrator believed that plaintiff asked her credit card company to reverse *all* charges when, in fact, she only requested the future payment portion. For that reason, plaintiff's attorney asked the arbitrator to recuse himself in an April 24, 2018 letter.

The trial court heard arguments on plaintiff's motion on May 9, 2018. The parties agreed that the custody portion of the arbitration proceedings had concluded. After listening to plaintiff's counsel lengthy argument, the trial court noted:

> But under [MCL 600.5075], I don't see how you fit. It says an arbitrator, attorney, or party in an arbitration proceeding under this chapter shall disclose any circumstances that may affect an arbitrator's impartiality, including, but not limited to, bias, a financial or personal interest in the outcome of the arbitration, or a past or present business or professional relationship with a party.
>
> So this is not a financial interest.

Plaintiff's attorney argued that, even so, the arbitrator should not be able to use the fee dispute in connection with the custody dispute because "[t]his is something which had nothing to do with – let's say she jaywalked somewhere in California, or let's say she went through a red light, that wouldn't be part of a custody case . . . ." Counsel complained that the arbitrator was taking the fee dispute "personally." The trial court disagreed:

> [T]he issue is that she – that she gave the money, and a month later she pulls it back without telling anybody, after authorizing it, and indicates, you know . . . it's whether or not that's an issue, and it should go to her veracity under the Child Custody Act. I mean . . . her own character. . . . I don't think – I don't think Mr. Schnelz believed he was entitled to the money; I don't think Mr. Schnelz has an issue financially that he's not being paid. That's not the issue.

The trial court then ruled:

> Okay. Mr. Schwartz, respectfully, your motion is denied. This Court finds that the petitioner did not overcome the heavy presumption of judicial impartiality, and petitioner failed to establish a display of deeply seated favoritism or antagonism that would make fair judgment impossible.
>
> The Supreme Court case specifically indicates, and it's one of the cases that you cited – one of the cases you cited, sir, that judicial rulings alone almost never constitute a valid basis for bias or . . . partiality motion, and in and of themselves apart from the surrounding comments or accompanying opinions they cannot possibly show reliance upon extrajudicial source, and that they can only in the rarest circumstances evidence the degree of favoritism or antagonism required.
>
> And sir, so with regard to this, there is nothing that happens in a judicial proceeding that forms the basis of facts with regard to a case of improper proceeding here and of bias or impartiality on behalf of Mr. Schnelz.

Again, MCL 600.5075 governs disqualification of a domestic relations arbitrator. It provides:

(1) An arbitrator, attorney, or party in an arbitration proceeding under this chapter shall disclose any circumstance that may affect an arbitrator's impartiality, including, but not limited to, bias, a financial or personal interest in the outcome of the arbitration, or a past or present business or professional relationship with a party or attorney. Upon disclosure of such a circumstance, a party may request disqualification of the arbitrator and shall make that request as soon as practicable after the disclosure. If the arbitrator does not withdraw within 14 days after a request for disqualification, the party may file a motion for disqualification with the circuit court.

And MCL 600.5081(2) provides for the vacation of an arbitration award when:

* * *

(b) There was evident partiality by an arbitrator appointed as a neutral, corruption of an arbitrator, or misconduct prejudicing a party's rights.

"[I]t seems well established that the partiality or bias which will overturn an arbitration award must be certain and direct, and not remote, uncertain or speculative." *North American Steel Corp v Siderius, Inc,* 75 Mich App 391, 404; 254 NW2d 899 (1977). "Thus, while it is conceded that arbitrators must disclose to the parties any dealings that might create an impression of possible bias, the impression must be a reasonable one. It is not any undisclosed relationship, no matter how peripheral, superficial or insignificant, that compels vacation on the grounds of partiality or prejudice." *Id.*

Plaintiff spends a good deal of time referring to case law involving the disqualification of judges. We find such law to be only tangentially related to the issue where MCL 600.5075 so clearly controls. Still, "[d]ue process requires that an unbiased and impartial decision-maker hear and decide a case." *Mitchell v Mitchell*, 296 Mich App 513, 523; 823 NW2d 153 (2012). Under MCR 2.003(C)(1), a judge must be disqualified from hearing a case in which he cannot act impartially or is biased against a party. However "[a] trial judge is presumed unbiased, and the party asserting otherwise has the heavy burden of overcoming the presumption." *Mitchell*, 296 Mich App at 523. "[J]udicial rulings, in and of themselves, almost never constitute a valid basis for a motion alleging bias, unless the judicial opinion displays a "deep-seated favoritism or antagonism that would make fair judgment impossible" and overcomes a heavy presumption of judicial impartiality. *Armstrong v Ypsilanti Charter Twp*, 248 Mich App 573, 597; 640 NW2d 321 (2001), quoting *Cain v Dep't of Corrections*, 451 Mich 470, 503; 548 NW2d 210 (1996). In fact, "a trial judge's remarks made during trial, which are critical of or hostile to counsel, the parties, or their cases, ordinarily do not establish disqualifying bias." *In re MKK*, 286 Mich App 546, 567; 781 NW2d 132 (2009).

MCR 2.003(C)(1)(b) provides that disqualification of a judge is warranted if "[t]he judge, based on objective and reasonable perceptions, has either (i) a serious risk of actual bias impacting the due process rights of a party as enunciated in *Caperton v Massey*, [556] US [868]; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), or (ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct." However,

The United States Supreme Court has disqualified judges and decisionmakers without a showing of actual bias in situations where "*experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.*" Among the situations identified by the Court as presenting that risk are where the judge or decisionmaker

(1) has a pecuniary interest in the outcome;

(2) "has been the target of personal abuse or criticism from the party before him";

(3) is "enmeshed in [other] matters involving petitioner ..."; or

(4) might have prejudged the case because of prior participation as an accuser, investigator, fact finder or initial decisionmaker. [*Cain*, 451 Mich at 498.]

Plaintiff fails to demonstrate that the arbitrator demonstrated partiality or bias such that he should have been disqualified. Moreover, the trial court, having dealt with plaintiff's numerous motions and being well-acquainted with the case, saw beyond plaintiff's claims. Even plaintiff admits that the arbitrator does not have a financial stake in the outcome of the proceedings, yet she persists in arguing that this "extrajudicial issue" has tainted the arbitrator's ability to remain impartial. However, as the arbitrator aptly noted, the issue of fees is not extrajudicial where the parties agreed to split the fees evenly. The trial court did not err.

## VI.  CONCLUSION

In Docket No. 339944, plaintiff sought, and received, an appointment of a GAL to investigate allegations of inappropriate conduct against defendant. Because these allegations had already been investigated, plaintiff readily agreed to pay any and all expenses for the GAL. However, once the GAL determined that there was no basis for the allegations, plaintiff balked at paying. She instead argues on appeal that the fee amounted to attorney fees for which she has an appeal by right. However, plaintiff does not have an appeal of right over the trial court's order requiring her to pay the GAL's fees because the record clearly reveals that the GAL was only incidentally an attorney and was not acting as an attorney in her investigative process. Plaintiff is not entitled to relief from the result of actions to which she not only consented, but requested.

In Docket No. 343213, plaintiff asked the arbitrator to approve a change of domicile. When things did not go her way, plaintiff switched tactics and argued that the arbitrator acted outside the scope of his authority when he denied plaintiff's motion for summary disposition on the issue of change of domicile. But, once again, it was plaintiff who placed the issue before the arbitrator. The parties' agreement prevented such a move without the other parent's consent or court order. Contrary to plaintiff's argument, the fact that the move would have brought the child closer to defendant was of no consequence. The trial court, therefore, did not err when it denied plaintiff's motion to vacate the arbitrator's opinion.

In Docket No. 343886, plaintiff – who readily agreed to submit to arbitration in accordance with the parties' parenting agreement – argues that the arbitrator had no basis for considering and deciding issues of custody because the arbitration agreement did not specifically set forth what, exactly, would be arbitrated. However, it is difficult to conceive of a broader

scope of arbitration than "all issues in the pending matter," as used by the parties. Consequently, the arbitrator had the authority to decide defendant's motion for a change in custody. Again, plaintiff agreed to something and then attacked the arbitrator's authority.

In Docket Nos. 344356, 344418, and 346344, plaintiff made several last ditch efforts to have the arbitrator disqualified for a number of reasons, including: ex parte communications, use of denigrating language toward women, and the arbitrator's alleged financial interest in the arbitration process. As discussed at length above, each of the arguments lack a basis in fact. At the time of the alleged ex parte communications, the arbitrator was acting in a dual capacity as arbitrator and mediator. Additionally, plaintiff offers no reasonable explanation for failing to bring the issue of potential bias against women to the court's attention when the statement was made even before the parties signed the arbitration agreement. Finally, as is the case with plaintiff throughout these proceedings, the issue of the arbitrator's alleged financial bias was one of her own making by stopping payment in violation of the parties' agreement to split the cost of arbitration and in violation of the arbitrator's instructions.

Affirmed.

/s/ James Robert Redford
/s/ Jane E. Markey
/s/ Kirsten Frank Kelly